1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    PATRICIA A. McCOLM,                        No. C 09-04132 SI

9                  Plaintiff,                   **ORDER DISMISSING CASE**

10      v.

11   FOREMOST INSURANCE CO.,

12                  Defendant.
     _____/

13

14          Pending before the Court is defendant's motion to dismiss.  Pursuant to Civil Local Rule 7-1(b),

15   the Court finds this matter appropriate for resolution without oral argument.[1]  Having considered the

16   papers submitted, and for good cause shown, the Court hereby GRANTS defendant's motion.

17

18                                **BACKGROUND**

19          *Pro se* plaintiff Patricia McColm filed this case against Michigan-based defendant Foremost

20   Insurance Company on September 4, 2009.  In the operative complaint, plaintiff brings two claims:  for

21   breach of an insurance contract and for breach of the implied covenant of good faith and fair dealing.

22   First Am. Comp. (Doc. 27) ¶ 1.  Plaintiff alleges that she is the assignee of her late father, George L.

23   McColm, who held a mobile home insurance policy issued by defendant.  *Id.* ¶ 6 & Ex. B.

24          Plaintiff alleges that there were two structures on George McColm's property on Deadwood

25

26          [1]       This motion was originally noticed for hearing on July 15.  Plaintiff submitted a request
     for an extension of time to file her opposition brief, and indicated to the Court that she would be
27   unavailable to attend a hearing for medical reasons for some time.  The Court granted plaintiff an
     extension of time, vacated the hearing, and indicated that it would take the matter under submission
28   when briefing was completed.  Order (Doc. 195).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Road, a mobile home and another structure that defendant has called the "red house."  She alleges that "[o]n or about September 2002" a "continuing burglary was committed into the Premises" and, either at the same time or separately (it is not clear from the complaint), the property "suffered invasion by vandals."  *See id.* ¶¶ 8, 10.  Plaintiff lists and provides an estimated cash value of twenty-two types of items that were allegedly stolen from the premises during the burglary, including a tractor with accessories worth over $43,000.  *Id.* ¶ 9.  She alleges that the vandals rendered the premises uninhabitable, and that one of the structures "was completely destroyed with all appliances for a[] . . . total loss."  *Id.* ¶¶ 10, 11.  Plaintiff alleges losses stemming from the destruction of the properties, her attempts to repair the properties, and the necessity of making alternate living arrangements.

Plaintiff alleges that defendant at no time made "a good faith offer to pay for emergency repairs, debris removal/cleaning, damage to the dwelling or other structures, for loss of use, to replace stolen and damaged personal property, for additional living expense [or] other covered loss amounts or to settle the claims with the insured."  *Id.* ¶ 12.  She alleges that defendant "wrongfully acted to 'retroactively' cause cancellation of the policy of insurance."  *Id.* ¶ 15.  She alleges that

> At no time during the lifetime of George, did the defendants take the oral examination of its insured; in spite of the fact[] that it knew George was a man in his 90's; and in spite of the contention[] that it needed more information regarding items of stolen property.  The conduct of defendants was and is an egregious attempt to take financial advantage of an elder insured, by its delay in either timely settling or denying the claim and by failure to take steps to establish the facts of the claim during the life of the insured.  Thus, it appears that Foremost was awaiting its insured's death, in hopes of avoiding payment of a policy limits claim and/or expecting to obtain an unfair advantage in proof of loss after the death of the insured.

*Id.* ¶ 18.

On the basis of comments made by defendant's claim representative who inspected the property, plaintiff alleges that

> Foremost had sufficient information to consider all the damage as to the covered premises to be associated with one or *more* covered dates of loss; but instead, attempted to consider the entire scope of loss to be limited to a single date and attempted to use [a] small payment check [for a door that the sheriff "kicked in"] as a wrongful attempt to "trick" the insured into a release of losses in excess of the policy limits for a mere $1,318.55.

*Id.* ¶ 21.[2]

_____

[2]        All emphasis is original unless otherwise noted.

In its answer to plaintiff's first amended complaint, defendant raises a number of affirmative defenses. Several of the defenses rely on assertions that plaintiff either breached or failed to comply with the terms of the insurance contract, or did not satisfy a condition precedent to liability pursuant to the policy. Answer ¶¶ 43, 50, 53, 54. Others rely on assertions that plaintiff did not provide notice of loss or proof of loss as required by the insurance contract, did not protect the property from further damage, and did not keep records of repair costs. *Id.* ¶¶ 48, 49, 57.

After being ordered to do so by the Court, plaintiff appeared for a deposition on May 18 and May 19, 2011. The deposition had been scheduled over the course of two days to accommodate plaintiff's medical needs. Shortly thereafter, defendant Foremost Insurance Company filed a motion to dismiss, arguing that plaintiff's conduct on those two days effectively prevented defendant from taking her deposition. The Court ordered defendant to file a supplemental statement explaining how its purported inability to depose plaintiff interfered with its ability to defend the case. Order (Doc. 187).

## LEGAL STANDARD

Discovery misconduct is sanctionable under Rule 37 of the Federal Rules of Civil Procedure. *Sneller v. City of Bainbridge Island*, 606 F.3d 636, 640 n.4 (9th Cir. 2010). A Court may sanction a party who "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). More specifically court may sanction a party if she "fails, after being served with proper notice, to appear for [her] deposition." Fed. R. Civ. P. 37(d)(1)(A)(I).

In sanctioning a party for either violation, a court may issue an order

(i) directing that the matters embraced in the [disobeyed] order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit

3

**United States District Court**
For the Northern District of California

to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A); *see also* Fed. R. Civ. P. 37(d)(3) (referring to the sanctions in Rule 37(b)(2)(A)).[3]

The sanction of dismissal is a harsh penalty, and it is only justified if a litigant's "disobedient conduct" rises to the level of "willfulness, bad faith, or fault"—which means the conduct has not been shown "to be outside the control of the litigant." *Henry v. Gill Indus.*, 983 F.2d 943, 948 (9th Cir. 1993). Additionally, "the district court must weigh five factors before imposing dismissal: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

"[W]here a court order is violated, factors 1 and 2 support sanctions and 4 cuts against case-dispositive sanctions, so 3 and 5, prejudice and availability of less drastic sanctions, are decisive." *Valley Engineers Inc. v. Electric Engineering Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998). With regard to factor three, "[a] defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990). While "[d]elay alone has been held to be insufficient prejudice," a party's "repeated failure . . . to appear at scheduled dispositions compounded by [her] continuing refusal to comply with court-ordered production of documents constitutes an interference with the rightful decision of the case" and prejudice is established. *Id.* "[F]actor 5 involves consideration of three subparts: whether the court explicitly discussed alternative sanctions, whether it tried them, and whether it warned the recalcitrant party about the possibility of dismissal." *Valley Engineers*, 158 F.3d at 1057. However, "it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning." *Id.*

---

[3]   Where a court sanctions a party for failing to appear at a properly noticed deposition, "the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3). In this case defendant does not request expenses, and in any event the fact that plaintiff is proceeding *pro se* and *in forma pauperis* would render an award of such expenses unjust.

**DISCUSSION**

Defendant has moved to dismiss this case, arguing that "plaintiff's conduct at her deposition was objectionable, non-cooperative, and non-responsive in direct violation of the Court's order" requiring her to appear and be deposed.  Def. Mot. (Doc. 182) at 1.  Defendant argues in its motion that "plaintiff's conduct was designed to frustrate legitimate discovery, was marked by outbursts, long speeches, accusations, finger waggling and personally insulting attacks."  *Id.*  Additionally, defendant argues that "plaintiff refused to provide basic information that was within her knowledge . . . such as the names of . . . witnesses who could testify to essential facts regarding this purported loss."  *Id.*

**I.      Prior court orders regarding disclosures, discovery, and conduct of litigation**

This action was filed in September, 2009.  In June 2010, the Court set a non-expert discovery cutoff date of March 31, 2011.  *See* Pretrial Order (Doc. 36).  Since that time, the Court has been required to intervene in a number of disputes regarding discovery and the conduct of the litigating parties. The Court has provided plaintiff with repeated and specific warnings regarding the manner in which she has conducted this litigation, and the possible consequences of failing to comply with discovery duties and court orders.

The Court has urged both parties generally to be diligent in their duties to respond fully, accurately, and in a timely manner to discovery requests; and generally to work with each other respectfully and with the understanding that each party is acting under certain constraints.  December 3, 2010 Order (Doc. 90), at 8–9. In particular, the Court has informed the parties that they are expected to conduct themselves with decorum and avoid the use of profanity or name calling.  *See* December 17, 2010  Order Denying Motions (Doc. 97), at 2–3 ("[T]he denial of defendant's motion [to prohibit plaintiff from engaging in verbally abusive conduct] **<u>does not mean</u>** that the Court condones the use of profanity or name calling.  The Court does not and expects the parties, including plaintiff, who has been trained in the legal profession, to conduct themselves with the decorum that is expected of all attorneys.").

In several orders, the Court has informed plaintiff of her discovery obligations, that she is not excused of her obligations because of how defendant may or may not have acted, and the specific proper

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

ways of addressing her concerns about privacy and defendant's discovery obligations.[4]  In one order,

the Court quoted to plaintiff the text of Rule 26(a)(1)(E) of the Federal Rules of Civil Procedure, with

the following emphasis included:  "**A party is not excused** from making its disclosures because it has

not fully investigated the case or because it challenges the sufficiency of another party's disclosures or

because another party has not make its disclosures."  December 17, 2010 Order re: Discovery (Doc. 96),

at 2.  In another, the Court informed plaintiff that if plaintiff is concerned about who can access

deposition recordings and transcripts, she must file a motion for a protective order outlining her specific

concerns.   September 28, 2010 Order Denying Motion (Doc. 73), at 1.

The Court has also ordered plaintiff to perform specific tasks by certain dates, and informed her

of the specific sanctions that she risked if she did not meet those deadlines.  For example, in December

of 2010, the Court ordered plaintiff to provide specific identifying and contact information for witnesses

listed in her disclosures.  Order re: Discovery (Doc. 96), at 2.  The Court informed plaintiff that "**she**

**risks being unable to call these witnesses at trial or rely on their expected testimony at any point**

---

[4]      Once again, in opposition to this motion, plaintiff argues that she should not be sanctioned because defendant has also failed to comply with discovery orders.  Once again, the Court replies that it is not proper for a party to refuse to comply with discovery obligations—must less a court order—because that party believes that its opponent has failed to comply with discovery obligations or court orders.  As plaintiff has been informed, in such a case she must seek the assistance of the Court.
      Moreover, it does not appear that defendant has violated the two discovery orders that plaintiff cites.  Contrary to plaintiff's assertion, the December 3 Order did not instruct defendant to turn over documents in response to plaintiff's requests for manuals, policies, and procedures.  Rather, it ordered "the parties . . . to meet and confer regarding plaintiff's requests."  December 3 Order (Doc. 90), at 5.  In response to defendant's effort to schedule a meet-and-confer session, on December 9, 2010 plaintiff sent a fax declining to meet when requested, concluding that "the Court's order is clear and you can comply with each discovery request by your own investigation of defendant's failure to disclose each manual requested . . . .  YOU CAN MEET AND CONFER WITH YOUR OWN DISCOVERY RESPONSES . . . AND FIND YOU DID NOT COMPLY AND ACT TO DO SO IN ACCORDANCE WITH THE COURT'S ORDER."  *See* Def. Reply, Ex. D.  On March 4, 2011 still not having been able to resolve the dispute with plaintiff, defendant filed a motion to compel plaintiff to execute a protective order so that defendant might turn over the internal insurance documents.  *See* Def. Motion (Doc. 108).  On April 28, then-Magistrate Judge Chen entered the proposed protective order, and stated that "any party wishing to receive [the production of confidential information] must sign a statement agreeing to abide by its terms and provide such signed statement to the opposing party before documents deemed confidential are produced."  Order (Doc. 157), at 2.  It does not appear that plaintiff has ever signed such a statement.
      Plaintiff also argues that defendant violated the Court's order of May 3, 2011 by terminating the deposition without calling the Court for assistance.  As discussed below, the Court did not order the parties to ask the Court for assistance if disagreements arose during the deposition.  Rather, the Court indicated that it might be available if such disputes arose.  *See* May 3 Order (Doc. 160), at 3 n.5.  Moreover, if plaintiff had desired the assistance of the Court, she could have attempted to contact the Court herself.

**United States District Court**
For the Northern District of California

**during these proceedings**" if she did not provide such information by January 14, 2011. *Id.* at 3. In the same order, the Court instructed plaintiff to provide defendant with any documents that she intended to rely upon at trial that had not already been disclosed. *Id.* at 4. The Court also ordered plaintiff to provide defendant with more specific descriptions of documents disclosed by defendant on which she intended to rely in support of her claims, or to provide defendant with copies of the documents. *Id.* The Court informed plaintiff that if she failed to provide information about documents by January 14, 2011, "**she risks being disallowed from presenting them to the Court as evidence**." *Id.* The Court also ordered plaintiff to disclose any documents and other evidentiary material that she intended to use to prove damages, including "the approximate content of her own testimony" if she would be relying on her own testimony to prove damages, by January 14, 2011. *Id.* at 5. The Court informed plaintiff that "**she risks being disallowed from presenting any of that evidence later in the case**." *Id.* In that same order, the Court ordered plaintiff to respond to outstanding requests for admissions, requests for production of documents, and special interrogatories, by that same date. *Id.* at 6. The Court reminded plaintiff "that she is **required** to comply with Court orders and faces serious sanctions if she does not, including but not limited **to plaintiff's inability to rely on objections that she wishes to assert in her responses**." *Id.* The Court explained that it would not penalize plaintiff, as long as she provided "**complete** responses to defendant's discovery requests in accordance with this order." *Id.* at 7.

In February 2011, the Court referred discovery to then-Magistrate Judge Chen. On April 28, 2011, Judge Chen found that plaintiff had failed to provide documents or more specific descriptions of documents, as ordered by this Court in December. *See* Order (Doc. 157), at 3. Judge Chen did not sanction plaintiff at that time, instead providing plaintiff with "one more opportunity to comply" by May 11, 2011, and imposing the self-executing order that "[a]ny documents not so timely served shall be deemed disallowed from evidence at trial." *Id.* at 4. Both the Court and Judge Chen denied plaintiff's later request for an extension of that deadline. *See* Order (Doc. 164); Order (Doc. 165).

### III.    Prior court orders regarding plaintiff's deposition

In addition to the discovery orders discussed above, the Court and Judge Chen have issued several orders regarding plaintiff's deposition. The most detailed and important order for the purposes

**United States District Court**
For the Northern District of California

of this motion was filed by the Court in response to defendant's May 6, 2011 motion to dismiss, or in the alterative, for an order continuing discovery, based on plaintiff's failure to permit herself to be deposed by the discovery cutoff. Def. Mot. (Doc. 127). The Court did not dismiss the case at that time. However, the Court did find that defendant had been attempting to work with plaintiff to schedule a deposition since July 2010. May 3 Order (Doc. 160), at 2. The Court found that defendant was prejudiced by not being able to depose plaintiff before the discovery deadline. *Id.* The Court extended the discovery cutoff, as well as the deadline for the filing of dispositive motions. *Id.* at 3–4. And the Court ordered that plaintiff appear for a deposition, and that the deposition be completed by May 19, 2011. *Id.* at 3.

The Court provided detailed instructions to plaintiff about her obligations:

> The Court notes that plaintiff has a preserved, standing objection to all questions asked at the deposition. Therefore, plaintiff does not need to state any objections during the deposition in order to preserve her right to raise an objection later in the litigation. Plaintiff may not make any speaking objections, other than prima facie valid claims of privilege. Additionally, like all deponents, plaintiff must answer all questions unless she has a prima facie valid claim of privilege. Other evidentiary objections, or objections to the form of questions, do not permit a deponent to refuse to answer. If plaintiff makes speaking objections beyond a prima facie valid claim of privilege, she will be subject to sanctions, and defendant may be permitted to extend the time of its deposition to compensate for time spent listening and responding to those objections. If plaintiff fails to complete her deposition by May 19, she will be subject to civil sanctions, up to and including her inability to rely on her own testimony at trial, or the dismissal of her claim in its entirety. **<u>No extensions of time will be granted</u>**.

*Id.* (footnote omitted). The Court permitted that, "[i]f any disagreements arise during the deposition, the parties may try to reach the Court by telephone. The Court may not be available. However, the Court does not anticipate there being any problems, as it should be clear that plaintiff is required to answer all questions, unless she has a prima facie valid claim of privilege." *Id.* at 3 n.5. The Court stated that plaintiff would not be granted any extension of time to complete her deposition. *Id.* at 4 n.8.

Upon agreement of the parties, plaintiff's deposition was noticed for May 18 and 19, 2011. On the morning of the 18th, the parties contacted the Court. Plaintiff requested permission to video record the deposition herself (the deposition was already being recorded by a third party), and plaintiff requested that the court reporter be ordered not to release any information obtained during the deposition to a third party. The Court granted both requests in a minute order. *See* Minute Entry (Doc. 178).

**IV.    Plaintiff's deposition**

Defendant argues that plaintiff repeatedly violated the Court's order that she not make speaking objections during the deposition, except for prima facie claims of privilege, and the order that she answer all questions unless they requested privileged information.  Additionally, defendant argues that plaintiff engaged in a pattern of abuse, repeatedly accusing defendant and defendant's counsel of misconduct.

The Court agrees.  The Court has reviewed both the written deposition transcripts and the video deposition DVDs[5] and notes that defendant's counsel did not once raise his voice beyond a normal indoor speaking level during the deposition, except when specifically requested by plaintiff to restate a question that she had been unable to hear.  Additionally, defense counsel's questions appear, on the whole, properly designed to elicit relevant testimony.  *See* Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

The following is a non-exclusive list of the ways in which plaintiff violated the Court order and, for all intents and purposes, refused to submit to a deposition.

**A.    Day One**

From the beginning of the first day of her deposition, plaintiff objected to questions on any number of bases other than privilege, and she refused to provide non-privileged answers to defense counsel's questions.  A representative example is a prolonged statement near the start of her deposition.  Plaintiff responded to a question about her employment history by stating that she did not "think" that it was "relevant to this process in the least."  TR 22:1–2.  Then, rather than answering the question, plaintiff continued as follows:

> [B]y the way, [I am acting] as my own representative here, as an attorney, I am maintaining and not waiving all statutory objections to the manner of taking the deposition; form of the question, oath, party conduct, form of the question, whether they're leading, ambiguous, compound, calls for narrative, or argumentative.  I'm

---

[5]    The transcripts and video deposition DVDs are lodged with the court file; see docket entry 198, dated June 10, 2011.  Understanding and evaluating the propriety of terminating sanctions in this case requires review of both the written and the video record.

considering that all those are all objections that apply to every question and the whole process. And I'm not going to repeat them individually unless the questioning becomes exceedingly onerous.

TR 22:3–11.

Plaintiff also repeatedly refused to provide information about family members and others who might have knowledge about the case, alternatively objecting and stating that she did not know, even after defendant explained why the questions were relevant to the case. This made it difficult to know whether plaintiff in fact did not know the answers to the questions, or whether she was simply refusing to answer them. For example, the following is part of the exchange that occurred when plaintiff was asked about her sister.[6]

**Q.**   **Do you know if [your sister] had a married name?**

A.    I think that all of this is a right of privacy for third parties that aren't relevant to this case. And she's entitled to her privacy, and she doesn't – I don't know. I don't have any information about her. I'm sorry.

**Q.**   **I'm just asking do you know her married name?**

A.    I have no personal knowledge of anything regarding my sister. Unfortunately – I tried to keep in touch; she's just not interested in – she's in – her own individual, and she's entitled to be her own individual, so I'm going to respect that. Thank you.

**Q.**   **Do you know her married name?**

A.    You're making a false assumption, and I don't know.

**Q.**   **Do you know if she is married?**

A.    I don't.

**Q.**   **Do you know the city she lives in?**

A.    I don't. Asked and answered. Objection. Asked and answered. I don't know. I'm going – this whole line of questioning is privileged and it's private and I must object.

**Q.**   **Do you know if [your sister] was in touch with your father in 2002 –**

A.    Objection. This whole line of privacy is subject to objection for privilege, privacy, and I don't know. I just have to say, I don't know. I don't recall.

---

[6]    Defendant has listed plaintiff's sister as a witness in its pretrial conference statement, stating that she "is expected to testify regarding dates George McColm lived at the subject residence and identify witnesses who have knowledge about the condition of the subject property." *See* Def. Pretrial Conference Statement (Doc. 204), at 7.

United States District Court
For the Northern District of California

1    Whatever it is you want to ask, I'm going to say it's privileged and it's not relevant.

2

3    **Q.    I'm trying to find out if [your sister] might have information or facts regarding or related to this loss?**

4    A.    She doesn't.

5    **Q.    If you haven't spoken to her –**

6    A.    If I haven't had communication with this woman.

7    **Q.    Right.**

8    A.    For years, and communication is very sketchy, at best.  There's no point in trying to harass and harangue me or her in this instance.  I have tried to open up opportunities for communication with her.  She doesn't want them.

9

10   **Q.    Ms. McColm –**

11   A.    And if you try to harass her, I can assure you she would tell you, and on far more less courteous terms than I would, that she has a right of privacy and she doesn't want to be bothered.  I'm forced to because I'm an assignee.  I have to put up [] with it, but she doesn't, and I wish I knew how to communicate with her, but I don't.  That's all I can tell you.

12

13

14   **Q.    Do you know if your sister communicated with George McColm in 2001 or 2002?**

15   A.    I don't know.

16   **Q.    That is why I want to be able to speak to her.**

17   A.    I don't know.  I don't know anything at all about that.

18   TR 23:12–25:21.  When defendant's counsel began asking questions about other family members who

19   might have knowledge about the case, plaintiff continued to object and refuse to answer, and she began

20   to accuse him of misconduct.  *See* TR 27:2–27:3 ("[T]he fact that you placed me in this deposition is

21   unconscionable. . . . I'm trying to bring to your attention you're harassing me."); TR 28:10–28:12, 28:20

22   ("[I]sn't discovery closed?  So why ask these questions when you know discovery is closed.  It's just

23   harassment. . . . [I]t sounds like it's harassment to me.").

24   Throughout the first day of the deposition, plaintiff objected to questions, refused to provide

25   answers, and made accusations when asked about a variety of topics in addition to her family.  For

26   example, defendant's counsel asked plaintiff about the two structures on the property, and in particular

27   attempted to clarify the words or terms that the parties were using to refer to each structure; what or who

28

11

damaged each structure; when each structure was damaged; and what plaintiff's claims are with regard

to each structure. These were proper questions, and plaintiff refused to answer many of them. Instead,

for example, she accused defendant of "try[ing] to create defenses by misuse of the terms," and she

accused defendant of trying to "confuse anyone who is reading this or watching this by asking a

question that you know is improper." TR 31:10–32:16. Defense counsel asked plaintiff questions about

when the loss occurred, resulting in the following exchange:

> **Q.     Do you know the date of loss?**
>
> A.     I think it's probably over a period of time. I think that your company's attempt
> to limit the date of loss to the September date, is not the date I reported initially
> to the insurance guy, and it's what your own agent tried to scam my father with
> and I am outraged.
>
> **Q.     Do you know the date of loss?**
>
> A.     Well, you know what, you guys haven't produce[d] your manuals that show how
> you define the date of loss. I want to know how you define what you consider
> a date of loss.
>
> You guys have been acting in bad faith trying to pinpoint it to only one date
> when I made it clear that isn't the date of the primary and major loss that
> occurred in this matter. And you've been trying to avoid that all along. Now is
> your opportunity to get it straight and pay up. That's what you can do.
>
> **Q.     Ms. McColm, I'm going to ask you to stop making speeches –**
>
> A.     I am trying to answer your question.
>
> **Q.     My question is:  When was the date of loss?**
>
> A.     You know what, that's exactly what I've been trying to get you guys to give me
> enough information to determine. It's over a period of time.
>
> **Q.     Ms. McColm, okay, when did you think it began?**
>
> A.     You guys are not going to try to pin me down to something that you'll say it's
> just one date of loss, no. And you're not going to lie about it. I am not going to
> let you do that, and I'm not going to let you do it at trial. And you're not going
> to get away with trying to minimize a huge loss that was devastating to my father
> in his last years, and you should never have done that to him. Shame on you.
> Shame on you.

43:3–44:8. Plaintiff ultimately did provide a guess as to when the loss began.

Sometimes, plaintiff would answer a question, and then continue by making an accusatory

speech. For example, when asked the eight word question "[w]hen did you find out about the loss,"

plaintiff replied:

12

When I reported it to – when the police called me in 2002. This is what I'm talking about. Don't try to confuse me like that, and don't ask me questions trying to entrap me in [that fashion]. That's dirty pool. That's bad faith questioning. Go back. You have to start over. I am not going to put up with this. This is what I mean about getting tired. Trying to do what I can to answer the questions. You're trying to take advantage of me. Ask a clear, straight, simple question, but don't play games with me.

TR 51:25–52:9.

Later, defense counsel returned to this question to attempt to narrow down the time period in 2002 when the police might have called plaintiff:

**Q.     Ms. McColm, what month was that that you –**

A.     I can't recall exactly when the first call took place from the sheriff, but I did go there after the first break-in and discover[ed] that everything was gone. Everything of any value at all was gone, totally gone, and everything was demolished and gone.

**Q.     Ms. McColm. Ms. McColm –**

A.     Thrown everywhere.

**Q.     Ms. McColm –**

A.     Everywhere.

**Q.     Ms. McColm –**

A.     It was a very emotional event.

**Q.     I'm asking you questions, I'm trying to get responses –**

A.     You got a response. I said yes, I did go there. What else can you ask?

**Q.     When did you go there? What was the month?**

A.     I don't recall the date.

**Q.     I'm asking what month?**

A.     I don't recall the month. I recall that I had a call from the sheriff about a major loss there, and I went there. I don't have a recollection of the specific date.

**Q.     Was that at the time that they arrested the vagrant?**

A.     No, it was not. And I made that very clear to you at the time, that you guys have been trying to con this whole case into believing that it was only in September when they caught the guy, not when the first loss that took everything that he had away.

That was absolutely outrageous, and don't play bad-faith games on that because I'm going to make sure you don't get away with this. That's what you've been trying to play games with since the get-go. That has never been correct. That

has never been correct and that has been your attempt to defend this case. It's not going to happen on this.

**Q.**   **Are you saying –**

A.   You guys are not going to lie about this. You had [an employee], who is the most outrageous, mean spirited, awful guy in the world who tried to create a con artist game to deny my elderly father his right to be compensated for his loss by making up this lie. Lie, absolute lie. You want my testimony, you got it. You want to know what I'm going to say at trial, you're getting it now because I'm not going to let you lie about it. Bottom line.

**Q.**   **I'm going to ask you once again, please respond to my questions.**

A.   I am responding to you questions because I'm very upset about what you did to my father. Yes, I'm going to be emotional about it, and I'm going [to] protect my father's right, even if he's dead. I will do the best I can to tell you people don't you dare discriminate and take advantage of the elderly like this, or people who are disabled. Shame on you. Shame on Foremost. They needed to do the right thing here.

**Q.**   **Ms. McColm –**

A.   Just because you don't like me doesn't mean that you shouldn't pay this claim.

**Q.**   **When did you receive notification from the sheriff that there had been a loss?**

A.   I don't recall the first time.

TR 55:2–57:9.

On quite a few occasions, rather than merely stating that she did not know the answer to a question, or responding to a direct and proper question about how she personally handled the insurance claims process, plaintiff berated defense counsel for not having asked the question of her father before he died. *See* TR 18:18–19:12; 20:14–20:17; 25:24–27:4; 35:4–35:16; 52:10–52:21; 53:5–53:17; 63:17–64:2; 66:11–66:23; 67:16–67:24; 81:16–81:20; 83:13–83:20; 91:4–92:10; 93:2–94:22; 109:13–110:10.

Plaintiff repeatedly accused defense counsel personally of misconduct, without any apparent basis in fact. For example, plaintiff explained that she sent discovery in a priority envelope because she wanted to "make sure you didn't try to play games with me on that I met the deadline." Defense counsel asked her to stop accusing him of things, and she responded "Oh, well, of course I have to because you don't do things properly. You keep trying to lie about things." TR 48:5–48:9. Later, when discussing the timing of defendant's denial of the insurance claim, plaintiff accused defense counsel of

14

"conveniently [acting] in your attorney scammer way to try and make sure that a year after he died, we would be able to make a claim against you. Shame on you." TR 97:21–97:24. At another point, when asked to clarify an answer about timing, plaintiff answered the question indirectly and then stated "That's the way nasty lawyer and liar lawyers operate." TR 117:3–117:4. Defense counsel asked for an apology.

> A.  If you took it personally, I apologize.
>
> **Q.  You said I was a nasty lawyer and I assure you –**
>
> A.  You have been very nasty with me, sir, you have been extremely nasty with me.
>
> **Q.  I'm not going to get into this with you.**
>
> A.  That's right.  Don't get into it because I know very well that you tried to manipulate as best you can to create a defense for Foremost . . . .  If you need an apology, I apologize and don't take it personally.  I'm just saying that, don't try to con me now into an answer that would be not correct.

TR 117:13–118:5.

Plaintiff also made clear that she had not finished investigating her own claim, and had not finished looking for documents that she was required to turn over to defendant.  For example, plaintiff was asked whether she reported the loss to her father's insurance agent in September 2003:

> A.  I believe it was earlier than that, but I can't recall for sure.
>
> **Q.  Do you have any records of when you reported the loss to [the agent]?**
>
> A.  I'm still looking for all of my correspondence, and I'm looking for any records that my father might have kept of his contacts with them.
>
> **Q.  I'm trying to find out about your contact with [the agent], when you reported the loss.**
>
> A.  I probably have some records somewhere, but I don't know what I produced or [have] not produced.  I can't recall right now.
>
> **Q.  What kind of form or what kind of record would you have that would indicate that you reported the loss to [the agent] in 2003?**
>
> A.  Well, I know I called them on the phone.  That I remember.  And it's possible that I wrote them or faxed them some letters also.  I can't be sure.  Could have faxed them something.  I like to use fax machines.
>
> **Q.  Would you – did you keep copies of the letters you wrote or faxed?**
>
> A.  I hope I did, but I'm still looking.

15

1    TR 40:8–41:9.

2

3        **B.    Day Two**

4        At the beginning of the second day of the deposition, plaintiff gave what she called "a sense of

5    an apology in a way" for her conduct the day before.  TR 134:9–134:10.  She explained that she had

6    forgotten to take her medicine, and that "[i]f I don't take my medication, my brain slows down and I

7    don't think very well and I get emotional and I don't function well."  TR 129:18–129:25.  However, on

8    Day Two she continued in the same pattern of objecting to unobjectionable questions, refusing to

9    provide relevant, non-privileged answers, taking control of the direction of conversation, and personally

10   attacking the defense attorney, if in a somewhat less egregious manner than on the first day.

11       For the first thirty-five minutes of the second day, plaintiff provided "corrections to the

12   deposition based on my condition from yesterday"; argued about whether defendant was obligated by

13   court order not to disclose any information provided in the deposition, even to an outside attorney

14   defense counsel might consult with on the case; and presented photographs and other documents and

15   explained their contents.  TR 129–152 (corresponding to testimony lasting from 9:22 a.m. until 9:57

16   a.m., per the clock on the video of the deposition).

17       When defense counsel began questioning plaintiff again, he asked her about whether a particular

18   incident in May or June 2002 "was the total loss of the *main house*."  TR 1252:22–152:25 (emphasis

19   added).  The following exchange resulted, in which plaintiff appeared to have misheard defense counsel

20   and on that basis accused him of misconduct, when the proper answer to his question, which plaintiff

21   ultimately provided, was *yes*:

22       **Q.    Let's move forward.  Who did you first tell, if anyone, about this initial main
             loss that you believe occurred in May or June of 2002 that was the total loss
23           of the main house?**

24       A.    Now you're trying to –

25       **Q.    Did I misstate that?**

26       A.    Yes, you did.

27       **Q.    Was the May-June loss, your best estimate of 2002, as that the total loss?**

28       A.    You see, this is where I have to just beg the court's indulgence to object to the

form of the question, which is already there.  I don't know how to bring to your attention that your – this is – [what] Foremost has done is they keep crossing apples and oranges.

**Q.    Please just respond to the question.  If you don't, I'm going to ask the court to –**

A.    Oh, Jesus.

**Q.    – strike your complaint.  You're not answering the questions.**

A.    That is not true, and you try to set me up when I'm trying to give you – you're trying to set me up, and I'm going to have to object to your abuse because you're not going to tell me the total loss was the mobile home.  It wasn't the total loss of the mobile home.  And it wasn't the mobile home –

**Q.    I have –**

A.    – In May or June, so –

**Q.    I have initial –**

A.    Don't do that to me.

**Q.    Don't yell at me, please.**

A.    Then don't try to trick me.  If you're confused, I'm happy to sort you out.

**Q.    Ma'am, what was the loss that occurred in May or June –**

A.    That was the –

**Q.    – 2002?**

A.    – that was the total loss to the red house.

**Q.    To the red house?**

A.    To you – use your term for it.  I'm calling it –

**Q.    How about the initial loss?**

A.    I'm calling that the north house.

**Q.    Please don't – you're calling the red house the north house; is that what you're –**

A.    That's the north house.

**Q.    Red is north.  Now, what is the initial main loss, is that what you're talking about, the red house in May, June 2002?**

A.    That's the one that's a total loss.

**Q.    Thank you, ma'am.**

TR 152:22–154:20. Plaintiff also refused to answer one question that she believed was "[asked and answered," accusing defense counsel of "harassing me with the same question." TR 162:17–162:20. She then provided a direct answer, stated that she didn't remember, and again accused defense counsel of harassing her. TR 163:4–163:6.

At one point, plaintiff asserted a claim of privilege, and then admitted that she did so only because she could not remember the answer to the question:

**Q.     Ma'am, is it your contention that the roof was damaged in any of the break-ins at the subject property?**

A.     What is the question again?

**Q.     Is it your contention that the roof was damaged in any of the break-ins or vandalism at the subject property?**

A.     Privilege; attorney work product.

**Q.     How is you contention as to whether the roof was damaged, privileged attorney work product?**

A.     My investigation.

**Q.     You've submitted – ma'am, you are the plaintiff. Do you refuse to answer the question?**

A.     Well, I don't know what the contention really is. I think that's something that's in the process of investigating – and I think that – I don't recall what the result of my investigation was. I was trying to remember, and that's why I called it attorney work product, because I can't recall what it is. I'm sorry about that.

TR 186:1–186:17.

Plaintiff's testimony, once again, indicated that she has not finished investigating the case and has not provided defendant with all the disclosures and discovery to which it is entitled. For example, plaintiff mentioned that there remain "massive amounts of boxes of my father's records and materials that still have been literally, physically impossible for me to lift and carry and get into." TR 143:13–143:15. Later, plaintiff again mentioned that she "might find something left in the 40-something left boxes or so" that she had yet to go through. TR 157:7–158:19.

Other testimony about documents was sufficiently nonresponsive that it is not clear whether plaintiff claims to have turned over all the documents in her possession or not, and when she first turned them over:

**United States District Court**
For the Northern District of California

**Q.** **And you produced some of the [electricity bill] payments made by George McColm for Trinity – to Trinity [County] PUD. Do you have more than just the ones you produced?**

**A.** Yes.

**Q.** **Where are they?**

**A.** You mean the ones that aren't relevant to the time period that you were talking about?

**Q.** **Actually, I believe they are relevant. I only have in the most recent production, August 2002, and then June of 2002.**

**A.** You wanted the period that was during the period of the loss. And I tried – you know, I didn't have a lot of time last night to pull this together for you.

**Q.** **I'm just asking –**

**A.** The period of time that you were concerned about between – to show you, you asked me if the electricity was on during this period. I'm giving you the evidence that I have that shows the electricity was on during the period. Do you need evidence that the electricity was on during some other period?

**Q.** **Ma'am, that's not what I asked. I asked you –**

**A.** You asked yesterday.

**Q.** **Stop.**

**A.** That's what you asked yesterday. That is what this is for.

**Q.** **You're wasting time. First of all, you didn't produce all of the ones –**

**A.** I didn't say I did.

**Q.** **I know.**

**A.** Because I was correcting testimony from yesterday trying to help you out. You know what, this is exactly the point. I try to do something nice and what is additional, and all you can do is just harass, harangue, and try to find fault. Bottom line, electric was on.

**Q.** **Ms. McColm, I'm asking specific questions. Do you have other invoices proving the utility charges for that property during – between May of 2002 and October 2002?**

**A.** Which property?

**Q.** **The Deadwood property.**

**A.** And does the Deadwood property include both of the accounts?

**Q.** **Yes, ma'am.**

19

1    A.    Well, I produced that to you.

2    **Q.    No.  You produced some of them to me today.**

3    A.    No, I produced these documents to you previously.

4    **Q.    How about canceled checks?  You produced some checks, but you didn't
           produce them all.  Do you have all the checks?**

5

6    A.    I don't recall.

     **Q.    That was my initial question, ma'am.**

7
     TR 182:16–184:14.

8

9           At one point, plaintiff mentioned the name of a person on her witness list.  Defendant mentioned

10   that she had "never given us his address or phone number."  Plaintiff said in return "Haven't been

11   ordered to, have I?"  TR 146:11–146:13.  In fact, plaintiff was specifically ordered to provide defendant

12   with that person's contact information last December, and she was informed that she may not be

13   permitted to call him as a witness if she failed to do so.  *See* Order re: Discovery (Doc. 96), at 2–4.

14

15   **V.    Sanctions**

16        **A.    Willfulness, bad faith, fault**

17          The Court finds that plaintiff is at fault for her violations of this Court's order.  Plaintiff's

18   conduct cannot be excused as medically outside of her control.   It was she who failed to take her

19   medication the first day of deposition, and she continued to disobey the Court's order on the second day.

20

21        **B.    The risk of prejudice to defendant**

22          In response to the Court's order to file a supplemental statement, defendant argues that plaintiff's

23   conduct at her deposition prejudiced defendant because she refused to testify to facts surrounding

24   several factual defenses.  For example, defendant "believes that any purported damages to the mobile

25   home property preexisted the reported loss period and w[ere] the result of continuous deterioration of

26   the Insured property and the personal contents due to the insured's age, his relocation to Redding, Ca,

27   and subsequently leaving of the property vacant."  Def. Suppl. Statement (Doc. 188), at 1.  Defendant

28   argues that it was prejudiced because plaintiff "refused to answer questions regarding the identities of"

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  family members and step-siblings, "potential witnesses with knowledge about the condition of the house

2  before and after the purported loss." *Id.*  And defendant argues that plaintiff "refused to answer any

3  questions and/or thwarted questions regarding her knowledge of the property or the contents at the

4  property before the incident." *Id.*

5         Defendant also explains that there are "significant disputed factual issues . . . around the nature

6  and extent of the claimed loss." *Id.* at 3.  Defendant argues that "plaintiff did not provide documentation

7  or support for the loss or losses during the course of the claim," and that at the deposition she "refused

8  to state when those losses began, how they occurred, when/how they were reported and any action to

9  mitigate the loss after discovery of the purported loss." *Id.*

10        Additionally, "during the processing of the insurance claim . . . Plaintiff refused to provide

11 [almost] any documentation evidencing the claim . . . [and] claims that she was disabled such that she

12 could not respond to inquiries." *Id.* at 4.  However, defendant argues, plaintiff "refused to describe any

13 disability . . . objecting on the basis of privacy" and she "refused to respond to multiple inquiries

14 regarding her responses to Foremost's requests . . . during the processing of the claim." *Id.*

15        Finally, defendant argues that the date that plaintiff reported the loss is relevant to "whether the

16 action is barred by the insurance policy's contractual limitations period." *Id.* at 5.  However, plaintiff

17 would not respond to questions about the date she reported the claim. *Id.*[7]

18        Plaintiff argues that defendant has not been prejudiced because "the entire deposition shows that

19 there is NO DEFENSE to this action" and "the actual deposition testimony negates the falsely assumed

20 FOREMOST defenses." Pl. Oppo. at 2–4.

21        A deposition is supposed to be a defendant's opportunity to ask plaintiff questions and receive

22 responsive answers, in part so that a defendant can determine for itself what defenses it might raise at

23 trial.  This is particularly so where, as in this case, a plaintiff is one of the sole repositories of

24 information about her claim.  Plaintiff appears to rely very little on documentary evidence, relying

25 instead on her recollection of events, and of the condition of the properties on Deadwood Road prior

26 to the losses.  But repeatedly, plaintiff refused to provide responsive answers, instead purporting to

27 ─────────────────

28        [7]      Plaintiff claims that defendant failed to respond to the Court's order to supplement its briefing in this case.  This is simply incorrect.

United States District Court
For the Northern District of California

1    determine for herself whether or not there are any defenses to her action.

2         Moreover, the deposition in this case was particularly important because, even at this late date,

3    the scope and basis of plaintiff's claims remains unclear.  This is due, in no small part, to plaintiff's

4    inexcusable lack of diligence investigating this case and complying with her disclosure and discovery

5    obligations.  Plaintiff was aware of the insurance claim for six years before filing this case.  Her father

6    assigned her this claim in April 2007.  *See* First Am. Comp. Ex. A.  The lawsuit has been pending for

7    nearly two years.  Yet, as it became clear during the deposition, plaintiff has yet to go through forty

8    boxes that might contain relevant information.   She continues to assert that she will rely on testimony

9    of witnesses whose contact information she may not have, and which she may not be prepared to

10   disclose, despite having been ordered to turn over the contact information by the Court.  *Compare* Pl.

11   Oppo. at 6 ("Plaintiff testified that witnesses named INCLUDING THE COUPLE'S HOUSEKEEPER

12   would testify that they did NOT live in the mess made by the vandals.") *with* Order re: Discovery (Doc.

13   96), at 2 (ordering plaintiff to disclose the names and contact information of "Myrick" and all workers

14   who worked at the Deadwood property between 2002 and 2007) & Depo. TR 193 (plaintiff: explaining

15   that "Myrick" may be a mistranscription of the name of the housekeeper; and stating that she

16   "guess[es]" that defense counsel could contact housekeeper through her "if I can find her number" and

17   "if she wants to be contacted").

18        Plaintiff is impecunious, asserts that she suffers from various disabilities, and has been acting

19   without the assistance of an independent attorney.  Because of this, the Court has extended the times by

20   which she is required to respond to motions and discovery requests generally, and has repeatedly

21   granted specific time extensions or excused late submissions.  The Court has granted plaintiff leave to

22   appear at hearings and conferences by telephone.  When defendant has requested sanctions in this case,

23   the Court has declined to award them.  But it is important to note that plaintiff filed this case.  It is she

24   who has made a legal claim against another.  She is obligated to pursue her case diligently, to meet her

25   obligations, and to be prepared.

26        Because plaintiff has effectively refused to allow herself to be deposed with regard to the factual

27   basis of her claims or defendant's defenses, and because she is the primary repository of information

28   regarding this case, the risk of prejudice to defendant of being required to continue to litigate this case

1    is high.

2

3         **C.     The availability of less drastic sanctions**

4         There are no less drastic sanctions available that will cure the prejudice to defendant and allow

5    the parties to continue to litigate this case.  As described above, the Court has repeatedly put plaintiff

6    on notice of her obligations as a litigant in this matter, and it has repeatedly put plaintiff on notice of

7    the possibility of sanctions.  Her conduct at the deposition prejudiced defendant with regard to both

8    claims.  Thus, for the Court to direct that the matters embraced in the violated order be taken as

9    established for purposes of the action, the Court essentially would be directing a verdict in favor of

10   defendant.

11        Monetary sanctions are improper, as plaintiff is proceeding both *pro se* and *in forma pauperis*.

12        Nor is granting another stay appropriate or likely to alleviate the prejudice to defendant.  Two

13   years into this litigation, plaintiff has not finished investigating her own claims, despite many orders

14   over the past year that she comply with specific disclosure obligations and discovery requests.  Although

15   ordered to appear at a deposition and answer all questions unless she had a prima facie valid claim of

16   privilege, plaintiff refused to answer many categories of questions directly relevant to her theories of

17   liability and defendant's defenses.  The Court recognizes the public policy favoring disposition of cases

18   on their merits, but does not believe that it is possible for that to happen in this case, no matter how long

19   the Court were to stay the case.

20        Based on the record plaintiff has created in this case, and whatever the merits of the original

21   claims, it will be impossible for a jury to make a fair determination of the merits of plaintiff's claims.

22   No sanction less drastic than dismissal is appropriate.

23

24

25

26

27   ///

28   ///

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court GRANTS defendant's motion to dismiss, WITH PREJUDICE. (Doc. 182.)

**IT IS SO ORDERED.**

Dated:  August 30, 2011

_____
SUSAN ILLSTON
United States District Judge

24